UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                     Case No. 16-cr-20460

v.

                                     HON. MARK A. GOLDSMITH

EDWIN MILLS, et al.,

        Defendants.

_____/

## OPINION & ORDER
## DENYING DEFENDANT ROBERT BAYTOPS'S MOTION TO SUPPRESS EVIDENCE
## (Dkt. 589)

        This matter is before the Court on Defendant Robert Baytops's motion to suppress all of the physical evidence seized during the execution of a search warrant at 15269 Troester Street in Detroit, Michigan (Dkt. 589). The Government has filed a response in opposition to the motion (Dkt. 625).[1] For the reasons discussed below, the Court denies the motion.

## I. BACKGROUND

        A federal grand jury returned a second superseding indictment on February 28, 2018, charging the eleven defendants in this case with various crimes, including violations of the Racketeering Influenced and Corrupt Organizations Act (the "RICO" Act), 18 U.S.C. § 1961 et seq. See generally 2d Superseding Indictment (Dkt. 292). That indictment claims that Defendants were members and associates of a criminal enterprise—the "6 Mile Chedda Grove" street gang in Detroit—one of whose purposes was to "preserv[e] and protect[] the power, territory, reputation, and profits of the enterprise through murder, robberies, intimidation, violence, and threats of

---

[1] Because oral argument will not aid the Court's decisional process, Baytops's motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

violence." Id. at 2, 6. The enterprise purportedly operated on the east side of Detroit within an area bordered roughly by East McNichols Road to the north, Kelly Road to the east, Houston-Whittier Street to the south, and Chalmers Street to the west. Id. at 2.[2]

The indictment further alleges that the enterprise's profits derived primarily from the sale and distribution of controlled substances, including crack cocaine, heroin, and morphine. Id. at 5. The sale and distribution alleged was not limited to Michigan; gang members and associates purportedly sold and distributed controlled substances in Ohio, Kentucky, Tennessee, Alabama, and West Virginia. Id.

Five of the eleven defendants have since pleaded guilty.[3] The six remaining defendants have been separated into two groups with separate trial dates. See 8/7/2018 Order (Dkt. 425). Group One, composed of four defendants who are not subject to the death penalty upon conviction, has a trial date of April 23, 2019. See Group One Scheduling Order (Dkt. 464); 9/21/2018 Status Conference (finalizing Group One trial date). Group Two, composed of two defendants who are death-penalty eligible, has a trial date of April 21, 2020. See Group Two Scheduling Order (Dkt. 475). Defendant Robert Baytops belongs to Group One and has been charged with one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d).

As part of the federal investigation into the 6 Mile Chedda Grove gang, law enforcement officials interviewed a confidential informant, referred to as Cooperator 3 in FBI Special Agent Lance Welker's affidavit in support of a search warrant, on October 19, 2016. Ex. 1 to Def. Mot., Aff. at 2-3, 16 (Dkt. 589-1). Cooperator 3 is a member of the 6 Mile Chedda Grove gang and has

---

[2] The "Chedda Grove" part of the enterprise's name is partially derived from one of the main streets in this territory—Cedargrove Street. 2d Superseding Indictment at 2.

[3] These five defendants include Mario Jackson, Michael Richardson, Corey Mills, Devontae Russell, and Phillip Peaks.

been affiliated with members of the gang for several years.  Id. at 2, 10, 16.  Cooperator 3 informed the officials that Defendant Michael Richardson is also a member of the gang and was residing and conducting narcotics trafficking at 15269 Troester Street on behalf of other gang members, including Defendant Donell Thompson.  Id. at 3, 5, 16.  Cooperator 3 described the residence as "a red brick house on Troester, between Brock and Hayes," that was equipped with security cameras visible from the street.  Id. at 3, 17.  According to Cooperator 3, a blue Chrysler Pacifica is usually parked outside the house and is used by Richardson.  Id. at 3, 17.  Cooperator 3 further stated that he had been previously been inside the house with Richardson.  Id. at 17.

On October 21, 2016, after he was released from jail, Cooperator 3 called one of the law enforcement officials and stated that both Richardson and the inside of 15269 Troester Street appear in a YouTube video entitled "Team Eastside Peezy – I'm Good pt. 3"  Id.[4]  According to Cooperator 3, Richardson is visible in the video for a few seconds blowing smoke.  Id.  The affiant viewed the video, which had a published date of September 26, 2016, and he believed a black male with long hair and a beard depicted thirteen seconds into the video had physical features consistent with law enforcement database pictures of Richardson.  Id.

Another confidential informant, referred to as Confidential Human Source 1 ("CHS-1"), indicated that he or she is affiliated with several members of the 6 Mile Chedda Grove gang, and that Richardson is a member the gang and was residing and conducting narcotics trafficking at 15269 Troester Street on behalf of other gang members, including Baytops.  Id. at 3, 5.  Like Cooperator 3, CHS-1 also stated that a blue Chrysler Pacifica is usually parked at the house.  Id. at 3.

---

[4] According to the affiant, "Peezy" is a nickname of Defendant Phillip Peaks, a known 6 Mile Chedda Grove associate and local rap artist, who widely disseminates videos depicting members of the gang with money, drugs, and guns.  Aff. at 17.

Following their interview with Cooperator 3, law enforcement officials conducted physical surveillance of 15269 Troester Street on October 20 and 21, 2016. The officials observed security cameras mounted on the exterior of the house. Id. at 4, 19-20. They also witnessed a blue Chrysler Pacifica parked in front of the house on both days. Id. at 4, 19-20. Late in the morning on October 20, officials observed the blue Chrysler Pacifica, which had previously been parked in front of 15269 Troester Street, moving in the vicinity of the house, and later backing in and out of the driveway of 14711 Cedargrove, which was located less than a mile from 15269 Troester Street. Id. at 4, 19-20.[5] While the van was parked in front of 14711 Cedargrove, the officials observed several suspected hand-to-hand drug transactions involving the driver of the van. Id. at 4, 20. In the afternoon on October 21, officials again observed the same blue Chrysler Pacifica pulling out of the driveway directly east of 15269 Troester Street. Id. at 4-5, 20. The van was subsequently found parked at 14711 Cedargrove, and it was later observed pulling out of the driveway and meeting a black Chevrolet Impala to perform a suspected hand-to-hand drug transaction. Id. at 5, 20.

Law enforcement officials thereafter sought a warrant on October 25, 2016, to search 15269 Troester Street and seize, among other things, evidence of narcotics and firearms. See Ex. 1 to Def. Mot., Warrant at PageID.3392 (Dkt. 589-1); Ex. 1 to Def. Mot., Items to be Seized at PageID.3394-3395 (Dkt. 589-1). The magistrate issued the search warrant that same day. See Warrant at PageID.3392.

A search was then conducted on October 26, 2016, during which officials seized numerous items, including a .45 caliber pistol, small plastic bags of suspected heroin amounting to 37.7

---

[5] According to the affidavit, Cooperator 3 identified 14711 Cedargrove as a location where drug transactions were conducted. Aff. at 20.

grams, a black plastic container of suspected marijuana weighing 71.2 grams, a plastic bag of suspected heroin weighing 90.1 grams, a Remington Model 870 twelve gauge shotgun, an ID card and Bridge card with Baytops's name, proof of residency for Richardson, several cell phones, a Glock Model 30 .45 caliber pistol, and over $9,000 in U.S. currency. See Gov't Resp. at 4. Richardson and Baytops were present in the house when the search warrant was executed, and they were both arrested. Id.

Baytops now seeks to suppress the physical evidence seized during the execution of the search warrant.

## II. DISCUSSION

In his motion to suppress, Baytops argues that he has standing[6] to contest the search of 15269 Troester Street, that the search warrant was not supported by probable cause, and that the good-faith exception to the Fourth Amendment's exclusionary rule does not apply. The Court addresses and rejects each argument in turn.

### A. No Legitimate Expectation of Privacy

The Fourth Amendment to the U.S. Constitution guarantees people the right "to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. As the Supreme Court has repeatedly emphasized, this Amendment "protects people, not places." Katz v. United States, 389 U.S. 347, 351 (1967); see also Rakas v. Illinois, 439 U.S. 128, 134 (1978)

_____

[6] Despite the pervasive use of the term "standing" in opinions, it should be noted that the Supreme Court has also rejected the concept of standing in the context of the Fourth Amendment. See Rakas v. Illinois, 439 U.S. 128, 139-140 (1978). Rather, "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" Minnesota v. Carter, 525 U.S. 83, 88 (1998) (quoting Rakas, 439 U.S. at 140); accord United States v. Britton, 335 F. App'x 571, 574 (6th Cir. 2009); United States v. Smith, 263 F.3d 571, 581-582 (6th Cir. 2001); United States v. King, 227 F.3d 732, 743 n.1 (6th Cir. 2000).

("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."). Thus, a person contending that a search violated his or her Fourth Amendment rights must first demonstrate that he or she had a legitimate expectation of privacy in the premises searched that "society is prepared to recognize as reasonable." Carpenter v. United States, 138 S. Ct. 2206, 2213 (2018); see also Kyllo v. United States, 533 U.S. 27, 33 (2001) ("[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."); Katz, 389 U.S. at 361 (a person has a legitimate expectation of privacy if he exhibits an actual, subjective expectation of privacy that society is prepared to recognize as objectively reasonable) (Harlan, J., concurring); accord United States v. Mathis, 738 F.3d 719, 729 (6th Cir. 2013); United States v. Whitehead, 415 F.3d 583, 587 (6th Cir. 2005).

Although there is no "single metric or exhaustive list of considerations" to use when determining whether a person has a subjective and objectively reasonable expectation of privacy, Byrd v. United States, 138 S. Ct. 1518, 1527 (2018), courts have often considered a variety of factors, including whether the person has (i) a "proprietary or possessory interest in the place to be searched or item to be seized"; (ii) "the right to exclude others from the place in question"; (iii) "taken normal precautions to maintain his privacy; and (iv) "exhibited a subjective expectation that the area would remain free from governmental intrusion," United States v. Allen, 720 F. App'x 254, 257 (6th Cir. 2018) (quoting United States v. Waller, 426 F.3d 838, 844 (6th Cir. 2005)); see also United States v. Dillard, 438 F.3d 675, 682 (6th Cir. 2006). Although courts also consider whether the person was legitimately on the premises, Allen, 720 F. App'x at 257; Dillard, 438 F.3d at 682, this factor, by itself, "is not enough to accord a reasonable expectation of privacy," Byrd,

138 S. Ct. at 1527 (quoting <u>Rakas</u>, 439 U.S. at 142). Nor is "a property right alone . . . determinative of whether the individual reasonably expected 'freedom from governmental intrusion.'" <u>United States v. King</u>, 227 F.3d 732, 744 (6th Cir. 2000) (quoting <u>Mancusi v. DeForte</u>, 392 U.S. 364, 368 (1968)).

Courts have routinely held that an overnight guest can claim a legitimate expectation of privacy in an authorized host's home. <u>See, e.g.</u>, <u>Minnesota v. Carter</u>, 525 U.S. 83, 90 (1998) ("[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not."); <u>Minnesota v. Olson</u>, 495 U.S. 91, 98 (1990) (recognizing an overnight guest's "legitimate expectation of privacy in his host's home"); <u>United States v. Vasquez</u>, 706 F. Supp. 2d 1015, 1023 (C.D. Cal. 2010) (recognizing that "an overnight guest is much more than someone who simply spends the night" because "[s]uch status is contingent upon an invitation by an authorized host" (citation, quotation marks, and emphasis omitted)). For its part, the Sixth Circuit has "broadly interpreted the Fourth Amendment to protect nearly all overnight guests," whether they are "renters, couch surfers, or nomads." <u>Allen</u>, 720 F. App'x at 257; <u>see also</u> <u>United States v. Washington</u>, 573 F.3d 279, 283 (6th Cir. 2009) ("The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests" and "has even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence." (citing <u>Waller</u>, 426 F.3d at 844)).

In his motion, Baytops contends that he was an overnight guest and has standing to contest the search of 15269 Troester Street because "the Government has recognized that Mr. Baytops was 'staying' in the Target Residence." Def. Br. at 4. However, Baytops provides no citation in support of the Government's purported concession that he was "staying" at the house. Even had he provided such a citation, this would still be insufficient to establish a legitimate expectation of

privacy. See United States v. Loera, 333 F. Supp. 3d 172, 179 (E.D.N.Y. 2018) ("The defendant's unsworn assertion of the Government's representations does not meet [his] burden" of establishing a legitimate expectation of privacy to contest the search.). Nor does he provide any facts in his motion supporting his claim that he was an overnight guest at the house. Cf. United States v. Pollard, 215 F.3d 643, 647 (6th Cir. 2000) (holding an occasional overnight guest who slept on the couch, sometimes ate meals with the family, was allowed to stay in the house when the residents were gone, and who kept belongings in a living room closet had standing under the Fourth Amendment). And because Baytops did not file a reply in support of his motion to suppress, despite having the opportunity to do, see 10/22/2018 Order at 1 (Dkt. 565), Baytops offers nothing to rebut the Government's argument that he does not have an expectation of privacy and was "simply present" at the house when the search warrant was executed. See Gov't Resp. at 5.

In other words, Baytops has failed to carry his burden of demonstrating that he had a legitimate expectation of privacy in the 15269 Troester Street house. His conclusory assertion of being an overnight guest, standing alone with no factual support in the record, is simply insufficient. See United States v. Reyes-Bosque, 596 F.3d 1017, 1027 (9th Cir. 2010) (holding that a defendant's "bald assertion that he was an overnight guest . . . is not sufficient to establish that he had a legitimate expectation of privacy in [the place searched]."); see also United States v. Castellanos, 716 F.3d 828, 833 n.4 (4th Cir. 2013) (noting that the defendant, who "was represented by able counsel," "made no effort to prove his standing or rebut the government's argument that he had none," and emphasizing that "it is not the duty of the court or the government to make [the defendant's] reasonable expectation of privacy case for him"); United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000) ("A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable a court to conclude that a

substantial claim is presented . . . . A court need not act upon general and conclusory assertions."); United States v. Ulbricht, No. 14-cr-68, 2014 WL 5090039, at *7 (S.D.N.Y. Oct. 10, 2014) ("Factual claims made in an affirmation by defendant's counsel may be an insufficient basis upon which to challenge a search if they are made without personal knowledge or are otherwise insufficiently probative."); United States v. Ruggiero, 824 F. Supp. 379, 391 (S.D.N.Y. 1993) ("It is well established that in order to challenge a search, a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search." (collecting cases)).[7] For this reason alone, the Court denies Baytops's motion to suppress.

### B. The Search Warrant was Supported by Probable Cause

Assuming for the sake of argument that Baytops has a legitimate expectation of privacy in the 15269 Troester Street house, the Court finds that there was probable cause to support the search warrant and no Fourth Amendment violation occurred.

For a search warrant to be valid, it must be supported by probable cause. U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

---

[7] Even though Baytops did not request an evidentiary hearing on his motion, such a hearing is not warranted under these circumstances. See, e.g., United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005) (holding that the district court did not err in denying the defendant's motion to suppress without conducting an evidentiary hearing because the "defendant failed to show that he could challenge the search under the Fourth Amendment, even assuming [the court] credited the facts asserted in his counsel's affirmation"); United States v. Cooper, 203 F.3d 1279, 1285 (11th Cir. 2000) ("Defendants are not entitled to an evidentiary hearing based on a 'promise' to prove at the hearing that which they did not specifically allege in their motion to suppress."); United States v. Sneed, 732 F.2d 886, 888 (11th Cir. 1984) (affirming district court's denial of the defendant's motion to suppress and refusal to hold an evidentiary hearing where the defendant failed to allege facts demonstrating a legitimate expectation of privacy in his motion); United States v. Sanchez, 846 F. Supp. 241, 243 (W.D.N.Y. 1994) ("In order to carry his burden, or even to warrant an evidentiary hearing on the issue, the defendant must offer evidence from someone with personal knowledge of the underlying facts to support the conclusion that the defendant had an expectation of privacy in the area searched.").

and particularly describing the place to be searched, and the persons or things to be seized.").

"Probable cause is defined as reasonable grounds for belief, supported by less than <u>prima facie</u> proof but more than mere suspicion." <u>United States v. Abernathy</u>, 843 F.3d 243, 249 (6th Cir. 2016) (citations and quotation marks omitted).

To determine whether an affidavit establishes probable cause, an issuing magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983); <u>United States v. McCoy</u>, 905 F.3d 409, 416 (6th Cir. 2018) (when reviewing a warrant application for indicia of probable cause, courts "read the affidavit reasonably . . . holistically, examining the totality of the circumstances and employing a healthy dose of common sense"). Accordingly, the affidavit must demonstrate "a nexus between the place to be searched and the evidence sought." <u>United States v. Laughton</u>, 409 F.3d 744, 747-748 (6th Cir. 2005) (quoting <u>United States v. Carpenter</u>, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)) (quotation marks omitted). "[W]hether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of the circumstances presented." <u>United States v. Brown</u>, 828 F.3d 375, 382 (6th Cir. 2016).

In reviewing the magistrate's probable-cause determination, this Court's task is to ensure that the magistrate had a "substantial basis" for his conclusion. <u>Gates</u>, 462 U.S. at 238-239. To encourage the use of and reliance on judicially approved warrants in the course of law enforcement investigations, "reviewing courts are to accord the magistrate's determination 'great deference,'" and a probable-cause determination "should only be reversed if it was arbitrarily exercised." <u>United States v. Allen</u>, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (quoting <u>Gates</u>, 462 U.S. at

236).  The Court's review for sufficiency of evidence is limited to the information contained within the four corners of the affidavit.  United States v. Coffee, 434 F.3d 887, 892 (6th Cir. 2006).

Baytops makes three arguments in support of his claim that the affidavit in support of the application for a search warrant did not establish probable cause.  The Court considers and rejects each argument.

### 1.  The Nexus Requirement

First, Baytops contends that the affidavit did not establish a sufficient nexus connecting 15269 Troester Street to any evidence of criminal activity.  See generally Def. Br. at 6-11. According to Baytops, the affidavit does not suggest that he either distributed or stored narcotics at the house.  Id. at 9.  Even though the affidavit alleges that he is a distributor of narcotics in Detroit, Baytops reiterates that there is no evidence contained in the affidavit that links him to either narcotics trafficking or the 6 Mile Chedda Grove gang.  Id. at 10-11.  The Court agrees with Baytops that the affidavit is rather bare bones in regard to his connection to the house.[8] Nevertheless, the Court finds that the affidavit clearly establishes a nexus between Richardson's alleged criminal activity and the evidence sought at 15269 Troester Street to establish probable cause for the search warrant.[9]

"The nexus between criminal activity and the item to be seized is automatic when the object of the search is contraband."  Abernathy, 843 F.3d at 249.  "A police request to search for illegal drugs therefore needs to satisfy only the second showing for a valid warrant: a fair probability that

---

[8] It appears that the only reference to Baytops in the affidavit appears on page 3 and provides as follows:  "CHS-1 also indicated that RICHARDSON is trafficking narcotics in cooperation with Robert 'R.B.' BAYTOPS, who has been previously identified by law enforcement as a member of the 6 Mile gang."  Aff. at 3.

[9] Baytops's failure to address the nexus between Richardson's alleged narcotics trafficking and the evidence sought at 15269 Troester Street is fatal to his argument.

the drugs will be found in a particular place." Id.  Although it is permissible for a court to infer that narcotics traffickers use their homes to store narcotics or otherwise further their narcotics trafficking (even though no criminal activity or contraband is observed there), a defendant's status as a drug dealer, standing alone, "is insufficient to tie the alleged criminal activity to the defendant residence." McCoy, 905 F.3d at 416-417; United States v. Jenkins, 743 F. App'x 636, 642 (6th Cir. 2018) (same).  Thus, for an affidavit to establish probable cause, it "must include some facts connecting the residence to drug-dealing activity beyond just the defendant's status as a drug dealer." Jenkins, 743 F. App'x at 642 (citing Brown, 828 F.3d at 382-384); see also McCoy, 905 F.3d at 417 (holding that "[t]he affidavit . . . must establish some other reason to believe that drugs or other evidence of crime [will] be found in the suspect's residence." (quoting Peffer v. Stephens, 880 F.3d 256, 273 (6th Cir. 2018))).  Here, the affidavit supplied such facts.

Law enforcement officials learned through two confidential informants that not only was Richardson a drug dealer and a member of the 6 Mile Chedda Grove gang, but that he was living and conducting narcotics trafficking at 15269 Troester Street, and that he utilized a blue Chrysler Pacifica.  During their surveillance, law enforcement officials observed the driver of the blue Chrysler Pacifica, which had previously been parked in front of the house, engage in suspected hand-to-hand drug transactions on two different occasions at a location less than a mile away from the house.  Thus, the affidavit does not simply suggest that Richardson was a drug dealer; it supplies ample facts connecting 15269 Troester Street to Richardson and narcotics trafficking. See, e.g., United States v. Ellison, 632 F.3d 347, 349 (6th Cir. 2011) (finding a sufficient nexus where an informant observed an individual leave the defendant's home, participate in a drug deal, and then return to the home); United States v. Berry, 565 F.3d 332, 339 (6th Cir. 2009) ("[S]tatus as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish

probable cause to search the home."); <u>United States v. Gunter</u>, 266 F. App'x 415, 419 (6th Cir. 2008) (holding that a nexus existed "between a known drug dealer's criminal activity and the dealer's residence when some reliable evidence exists connecting the criminal activity with the residence"). Because the magistrate had a substantial basis to conclude there was a sufficient nexus between Richardson's criminal activity and 15269 Troester Street, it can hardly be said that her probable-cause determination was arbitrarily exercised.

Although Baytops also argues that the affidavit does not allege that a confidential informant either purchased drugs at 15269 Troester Street or observed drugs inside the residence, <u>see</u> Def. Br. at 3, 10, the Sixth Circuit has held that "such a level of involvement is not required for a finding of probable cause." <u>Jenkins</u>, 743 F. App'x at 644 (citing <u>Gunter</u>, 266 F. App'x at 419); <u>id.</u> ("Drug dealers cannot immunize themselves from search of a residence used to store their supply simply by ensuring that all drug deals take place in parking lots.").

Furthermore, the case Baytops principally relies on to support his nexus argument—<u>United States v. Brown</u>, 828 F.3d 375 (6th Cir. 2016)—is distinguishable from the present matter. In <u>Brown</u>, the Sixth Circuit held that the affidavit in support of the application for a search warrant lacked a sufficient nexus between the defendant's criminal activity and his residence because it did not provide any facts that the defendant "distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." <u>Id.</u> at 382. Nor did the affidavit suggest that a reliable confidential informant had ever purchased drugs at the location, or that law enforcement conducted any surveillance at the residence. <u>Id.</u> And although a court may infer a fair probability of finding evidence in a residence despite the affidavit stating that such evidence had not been observed directly, the Sixth Circuit emphasized that a suspect's status as a

drug dealer, standing alone, cannot give rise to a fair probability that drugs will be found in the suspect's home.  Id. at 383.

Unlike in Brown, Cooperator 3 and CHS-1 both claimed that Richardson was a member of the 6 Mile Chedda Grove gang and was conducting narcotics trafficking at 15269 Troester Street. Subsequent law enforcement surveillance then corroborated the informants' information about the description of the house and presence of a blue Chrysler Pacifica.  During their surveillance, the officials also observed activity indicative of narcotics trafficking.  Thus, this is not a situation where the only information connecting Richardson to 15269 Troester Street was his status as a drug dealer.

### 2.  The Reliability of Confidential Informants

Second, Baytops argues that the affidavit lacked probable cause because it failed to establish the two confidential informants' veracity, reliability, and basis of knowledge.  See generally Def. Br. at 11-12.  According to Baytops, "the informants provided information that was not even criminal in nature: a blue Chrysler Pacifica was parked outside the residence, and there were security cameras on the exterior of the home."  Id. at 12.  Not only could "any person in the general public who happened down that street" have known these facts, says Baytops, they were "the only facts provided by the informants that were corroborated by law enforcement," which "added little to nothing to the probable cause calculus."  Id.[10]  The Court disagrees with Baytops's assertions and conclusions.

When an affidavit is based in part on information provided by a confidential informant, the court must "consider the veracity, reliability, and the basis of knowledge for that information as

_____

[10] In the statement-of-facts portion of his motion, Baytops also contends that the affidavit contained only conclusory allegations that the confidential informants were credible and reliable.  See Def. Br. at 2.

part of the totality of the circumstances for evaluating the impact of that information." United States v. Crumpton, 824 F.3d 593, 615-616 (6th Cir. 2016). These three are not evaluated independently, however, as "more of one compensates for less of the others." United States v. Hines, 885 F.3d 919, 925 (6th Cir. 2018); United States v. Stokes, 742 F. App'x 947, 950 (6th Cir. 2018) (describing this exercise as a "'sliding scale' that runs between less reliable tips (such as those [that] come from anonymous sources) and more reliable tips (such as those that come 'from known or reliable informants')").

"[W]hen the court is provided with assurances that the informant is reliable," "independent corroboration of the tip by police is not required." Crumpton, 824 F.3d at 616. In those situations, "the affiant need only attest 'with some detail' that the informant provided reliable information in the past." Id. (quoting United States v. Thomas, 605 F.3d 300, 307 (6th Cir. 2010)). In the absence of any intrinsic indicia of the informant's reliability and credibility, however, "'courts insist that the affidavit contain substantial independent police corroboration.'" Id. (quoting United States v. Frazier, 423 F.3d 526, 532 (6th Cir. 2005)); Hines, 885 F.3d at 925 ("Only when no substantial supporting evidence exists within the four corners of the affidavit as to the informant's reliability do courts require substantial independent police corroboration.").

Here, the affiant averred that CHS-1 was "credible and reliable" because he or she had been a confidential informant "for several years" and had "provided credible information used in numerous search and arrest warrants and has provided other corroborated and credible information." Aff. at 3 n.2. This assurance was sufficient to establish that CHS-1 was reliable. See, e.g., United States v. Moore, 661 F.3d 309, 313 (6th Cir. 2011) (finding reliability where the confidential informant "had given information in the past that had led to two drug seizures"); United States v. Martin, 526 F.3d 926, 937 (6th Cir. 2008) (affidavit's statement "that the

confidential informant in the present case is a known person who . . . previously provided information that resulted in seizure of illegal controlled substances . . . is sufficient to establish the informant's reliability"); United States v. Greene, 250 F.3d 471, 480 (6th Cir. 2001) ("Sixth Circuit precedent clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable."). CHS-1's affiliation with several members of the 6 Mile Chedda Grove gang also established his or her basis of knowledge. As a reliable informant with a sufficient basis of knowledge, CHS-1 told law enforcement officials that Richardson was a member of the 6 Mile Chedda Grove gang, residing and conducting narcotics trafficking at 15269 Troester Street. CHS-1 also stated that a blue Chrysler Pacifica was usually parked at the residence, which officials later corroborated.

Unlike CHS-1, the affiant did not suggest that Cooperator 3 had provided accurate and reliable information in the past. See Aff. at 2 n.1 (stating, in a conclusory manner, that Cooperator 3 is "believed to be credible and reliable," and noting that "Cooperator 3 is cooperating for judicial consideration, and is currently charged with being a felon in possession of a firearm in violation of Michigan law"). However, the affidavit did explain that Cooperator 3 was a member of the 6 Mile Chedda Grove gang, was affiliated with several members of the gang, and had previously been inside 15269 Troester Street with Richardson, which established Cooperator 3's basis of knowledge that Richardson was conducting narcotics trafficking at the house. Cf. Coffee, 434 F.3d at 895 (crediting an affidavit that "contains no averments that the informant was reliable based on prior contacts" but "does state that the CI had made several purchases in the past from [the suspect] at the specified address"). The level of detail Cooperator 3 provided the officials about the physical description of the house and the presence of a blue Chrysler Pacifica also weighs in favor of Cooperator 3 being reliable with a sufficient basis of knowledge. See United States v.

Howard, 632 F. App'x 795, 802 (6th Cir. 2015) ("In assessing an informant's 'basis of knowledge,' the degree of detail contained in a tip may be used to infer whether the informant had a reliable basis for making his statements.").

In any event, law enforcement officials independently corroborated the information that Cooperator 3 provided regarding the exterior of the house and the blue Chrysler Pacifica parked out front. The officials were also able to corroborate that Richardson was a member of the 6 Mile Chedda Grove gang by reviewing social media and contact information in other gang members' cell phones. See Aff. at 5. Although law enforcement officials were able to corroborate these arguably "easy to know (and innocuous) facts," the details Cooperator 3 provided, coupled with the officials' corroboration, places the Government on "the permissible side of the probable-cause divide." Stokes, 742 F. App'x at 952; see also United States v. Dyer, 580 F.3d 386, 392 (6th Cir. 2009) ("It has been the rare case in which the Sixth Circuit has found a search warrant based on an informant tip to be inadequate if the information has been corroborated to some degree." (emphasis in original)).

Moreover, the fact that both CHS-1 and Cooperator 3 gave the same accurate information regarding the description of the house, the presence of a blue Chrysler Pacifica parked at the house, and Richardson's membership in the gang lends further support to the magistrate's finding of probable cause. See Jones v. United States, 362 U.S. 257, 271-272 (1960) (rejecting the defendant's argument "that the warrant was defective because [the officer's] informants were not produced, because his affidavit did not even state their names, and [the officer] did not undertake . . . his own independent investigation of the claims made by his informants," where the court found that "there was a substantial basis for crediting the hearsay" because the affidavit stated that the unnamed confidential informants "had previously given accurate information,"

which was "corroborated by other sources of information"), <u>overruled on other grounds by</u> <u>United States v. Salvucci</u>, 448 U.S. 83 (1980).

Therefore, given the totality of the circumstances, this Court does not believe that the magistrate's probable-cause determination was arbitrarily exercised. Based on the information the two confidential informants provided, coupled with the independent police corroboration and observation of drug activity, the magistrate had a substantial basis for concluding that a search of 15269 Troester Street would yield evidence of criminal conduct.

### 3. Staleness

Finally, Baytops contends that any probable cause to search the house was stale because "all of the facts alleged in the affidavit were at least a month old at the time the search warrant was issued," and there was no indication of "ongoing criminal activity at the residence." Def. Br. at 13 (suggesting that all of the facts in the affidavit took place before September 26, 2016). Again, the Court disagrees.

"[S]tale information cannot be used in a probable cause determination." <u>United States v. Perry</u>, 864 F.3d 412, 414-415 (6th Cir. 2017). Because "drugs are usually sold and consumed in a prompt fashion," <u>United States v. Frechette</u>, 583 F.3d 374, 378 (6th Cir. 2009), information pertaining to the whereabouts of contraband can quickly "grow stale over time," <u>United States v. Church</u>, 823 F.3d 351, 356 (6th Cir. 2016). The staleness inquiry is a flexible one, however, and it is not meant "to create an arbitrary time limitation within which discovered facts must be presented to a magistrate." <u>Perry</u>, 864 F.3d at 415. "Information is considered stale and unreliable if it is impossible to tell from the affidavit when the circumstances giving rise to probable cause occurred." <u>Abernathy</u>, 843 F.3d at 250.

To begin, it appears that Baytops may be confused about certain dates pertaining to events described in the affidavit; it is clear that not all of the facts in the affidavit occurred prior to September 26, 2016, as Baytops claims. As set forth in the affidavit, the interview between federal law enforcement officials and Cooperator 3 took place on October 19, 2016. The officials then conducted their physical surveillance of 15269 Troester Street on October 20 and 21, 2016. The officials thereafter sought a search warrant on October 25, 2016, which was issued the same day. Thus, Baytops's assertion that "all of the facts alleged in the affidavit were at least a month old at the time the search warrant was issued" is not supported by the actual allegations in the affidavit. And because the length of time between the most pertinent events in the affidavit giving rise to probable cause and the application for the search warrant was only a matter of days, the Court finds that the information in the affidavit was not stale when the search warrant was sought on October 25, 2016. E.g., Perry, 864 F.3d at 414-415 (holding that evidence of drug sales two to fifty-one days before the probable-cause determination is recent enough to suggest that there may be further evidence of illegality in the place searched).

That being said, while the length of time between the events described in an affidavit and the application for a warrant is important, it is "by no means [the] controlling issue." United States v. Leaster, 35 F. App'x 402, 406 (6th Cir. 2002); United States v. Costello, 596 F. Supp. 2d 1060, 1065 (E.D. Mich. 2009) ("The [staleness] issue is to be resolved not by arbitrarily counting days on a calendar, but rather by determining whether the information offered in the affidavit, taking into account both its age and any corroboration, suffices to establish probable cause to search a particular place." (citing United States v. Spikes, 158 F.3d 913, 923-924 (6th Cir. 1998))). Instead, staleness often depends on the "inherent nature of the crime," taking into consideration the following four factors: (i) "the character of the crime"; (ii) "the criminal"; (iii) "the thing to be

seized"; and (iv) "the place to be searched." <u>Abernathy</u>, 843 F.3d at 250. The Court finds that each of these factors weighs against a finding of staleness.[11]

Regarding the first factor, the nature of Richardson's crime cannot be described in terms of a "chance encounter in the night," but, rather, it suggested an ongoing drug-trafficking conspiracy, of which Richardson was a participant. <u>Spikes</u>, 158 F.3d at 923; <u>see also</u> <u>United States v. Sinclair</u>, 631 F. App'x 344, 348 (6th Cir. 2015) (the first factor weighs against a finding of staleness where the nature of the defendant's crime was "an ongoing drug trafficking conspiracy"). At the time a search warrant was sought, the federal investigation into the 6 Mile Chedda Grove gang's purported sale and distribution of controlled substances in Michigan and other states had been ongoing since at least 2013. <u>See</u> Aff. at 6-7. Two informants claimed that Richardson is a member of the 6 Mile Chedda Grove gang, and that he was residing and conducting narcotics trafficking at the 15269 Troester Street house on behalf of other gang members. During the law enforcement officials' surveillance of the house, they also observed the driver of the blue Chrysler Pacifica, which had been routinely parked in front of 15269 Troester Street, engage in suspected hand-to-hand drug transactions at on two separate occasions less than a mile away from the house. This sort of information of ongoing criminal activity weighs against a finding of staleness. <u>See</u>

---

[11] Similar to his nexus argument, Baytops's arguments concerning the four staleness factors are primarily focused on the affidavit's failure to connect him with the 15269 Troester Street house. <u>See generally</u> Def. Br. at 14-15. For example, Baytops contends that the affidavit does not contain any information about him from the confidential informants, and that there is no corroborating information that he was engaged in drug trafficking at that location. <u>Id.</u> But as even a causal reader would gather from the affidavit, the focus of the law enforcement surveillance and subsequent search of the house was Richardson's purported narcotics trafficking. Thus, Baytops's failure to address whether the affidavit was stale based on the information provide to law enforcement officials about Richardson and the subsequent surveillance of the house is fatal to his staleness argument.

Greene, 250 F.3d at 481 ("Evidence of ongoing criminal activity will generally defeat a claim of staleness.").

Regarding the second and fourth factors, the information provided by the informants that Richardson resides at the 15269 Troester Street house also suggests that he was not "nomadic" but firmly "entrenched" in the Detroit metropolitan area in general, and the 15269 Troester Street house in particular. The house being equipped with exterior surveillance cameras, with their relative permanence and presumed purpose of security, would also suggest that the house was more of a "secure operational base" for the Richardson and the 6 Mile Chedda Grove gang, as opposed to a "mere criminal forum of convenience." Sinclair, 631 F. App'x at 348; see also Frechette, 583 F.3d at 379 (holding that a defendant's residence "is clearly a 'secure operational base'").

Regarding the third factor, the items to be seized included non-perishable items, including firearms and ammunition. See Items to be Seized at PageID.3394. The affiant also sought evidence regarding the ownership and occupancy of the residence, ledgers and logbooks used to record drug transactions, and digital photographs depicting narcotics and gang activity, see id. at PageID.3394-3395, all of which have enduring utility to its holder. See Sinclair, 631 F. App'x at 348; see also United States v. Abboud, 438 F.3d 554, 573-574 (6th Cir. 2006) (business records are a type of evidence that an agent ordinarily could expect would be kept for long periods of time); cf. Frechette, 583 F.3d at 379 (recognizing that digital "[i]mages typically persist in some form on a computer hard drive even after the images have been deleted" and that "such evidence can often be recovered by forensic examiners").

Therefore, based on the small amount of time that passed between the events giving rise to probable cause and the application for a search warrant, as well as the inherent nature of the crime, the Court finds that the information contained in the affidavit was not stale.

### C.  The Good-Faith Exception to the Exclusionary Rule Applies

Because the search warrant was supported by probable cause, the Court does not need to address whether the good-faith exception to the Fourth Amendment's exclusionary rule would apply.  Dyer, 580 F.3d at 393 (citing United States v. Pinson, 321 F.3d 558, 565 (6th Cir. 2003)).  For purposes of completeness, however, the Court finds that the exception would apply nonetheless.

Although the judicially developed exclusionary rule generally prevents the Government from using evidence obtained in violation of the Fourth Amendment against a victim of an unlawful search, a magistrate's error in issuing a search warrant does not necessarily require suppression of evidence.  McCoy, 905 F.3d at 415; Carpenter, 360 F.3d at 595 (same).  In United States v. Leon, the Supreme Court created an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective."  468 U.S. 897, 905 (1984).

To determine whether the good-faith exception applies, this Court must decide "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  Id. at 923 n.23.  The Supreme Court has identified four situations in which an officer's reliance would not be objectively reasonable:  (i) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit" that violated Franks v. Delaware, 438 U.S. 154 (1978); (ii) "where the issuing magistrate wholly abandoned his judicial role;" (iii) when the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official

belief in its existence entirely unreasonable;'" and (iv) when a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610-611 (1975) (Powell, J., concurring)); Abernathy, 843 F.3d at 257 (same).

This case involves the third scenario. See Def. Br. at 16. According to Baytops, the affidavit did not contain a minimally sufficient nexus and was so lacking in indicia of probable cause because it was "devoid of facts connecting the Troester residence to the alleged drug dealing activity," and because it did "not offer any facts that suggest[ed] there was a drug trafficking operation ongoing at the Troester residence." Id. at 17.[12] The Court disagrees.

An affidavit so lacking in indicia of probable cause that no reasonable officer would rely on the warrant is often referred to as a "bare bones" affidavit, and it is defined as "one that states only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." United States v. White, 874 F.3d 490, 496 (6th Cir. 2017). In other words, a bare-bones affidavit is simply "a conclusory affidavit, one that asserts only the affiant's belief that probable cause existed" and provides nothing more than "a mere guess that contraband or evidence of a crime would be found." Id.

An affidavit that lacks probable cause should not be confused with a bare-bones affidavit. Id. at 497 (recognizing that the distinction between the two "is not merely semantical" because "[t]here must be daylight between the 'bare-bones' and 'substantial basis' standards if Leon's

---

[12] Baytops also argues that "a significant amount of time passed between the events laid out in the affidavit, and the application for a search warrant." Def. Br. at 17. As previously noted, Baytops appears to be confused about the actual dates of events in the affidavit. See supra, Part II.B.3. Moreover, Baytops does not provide any authority that a few days constitutes a "significant amount of time" for purposes of applying the good-faith exception to the exclusionary rule.

good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function."). When an affidavit falls short of the probable-cause standard, but still contains a "minimally sufficient nexus between the illegal activity and the place to be search," it will not be considered bare bones. Id. at 496-497 (quoting Carpenter, 360 F.3d at 596). Thus, if the affidavit is able to establish "some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched," then the affidavit is not bare bones and official reliance on it is reasonable. McCoy, 905 F.3d at 416; Frazier, 423 F.3d at 536 (explaining that good-faith reliance on an affidavit requires a "less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place" (quoting Carpenter, 360 F.3d at 595)).

Here, the two confidential informants' assertions that Richardson was conducting narcotics trafficking at 15269 Troester Street; the independent police corroboration of the informants' description of the house, the presence of a blue Chrysler Pacifica parked in front of the house, and Richardson's membership in the 6 Mile Chedda Grove gang; and the law enforcement officials' observation of two suspected hand-to-hand drug transactions involving the driver of the van less than a mile away from the house demonstrate that the affiant was not simply guessing that contraband may be found at the 15269 Troester Street. Even if this information in the affidavit did not establish probable cause, it surely provided a modicum of evidence between Richardson's alleged narcotics trafficking and 15269 Troester Street. Therefore, the Court finds that the affidavit was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

## III. CONCLUSION

For the reasons stated above, Baytops's motion to suppress all physical evidence seized during the execution of a search warrant at 15269 Troester Street in Detroit, Michigan (Dkt. 589) is denied.

SO ORDERED.

Dated:  January 16, 2019                              s/Mark A. Goldsmith
        Detroit, Michigan                            MARK A. GOLDSMITH
                                                     United States District Judge